UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

EMA FINANCIAL, LLC,

                                        Plaintiff,


-against-                                           Docket No. 20-cv-08781-VSB


TPT GLOBAL TECH, INC.,

                                        Defendant.

_____



### DEFENDANT'S MEMORANDUM OF LAW IN IN OPPOSITION TO MOTION TO DISMISS COUNTERCLAIMS AND AFFIRMATIVE DEFENSES




Dated: March 1, 2021                    SALLAH ASTARITA & COX, LLC


                                        By: ___/s/ *MARK J. ASTARITA*_____
                                        Mark J. Astarita
                                        Attorneys for Defendant
                                        60 Pompton Avenue
                                        Verona, New Jersey 07044
                                        973-559-5566
                                        mja@sallahlaw.com




i

## Table of Contents

PRELIMINARY STATEMENT ....................................................................... 1

STATEMENT OF FACTS ............................................................................. 2

ARGUMENT ................................................................................................. 3

1.  TPT Has Not Made a Securities Fraud Claim ................................................. 3

2.  The Motion to Dismiss Must Be Denied ........................................................ 5

3.  Section 15 is Not Part of the Anti-Fraud Provisions of the Exchange Act . 5

4.  TPT Has Sufficiently Pled that EMA is an Unregistered Dealer ................. 6

5.  EMA Was Required to Register with the SEC as a Dealer ......................... 13

6.  Recission is an Appropriate Remedy for the Section 15 Violations .......... 16

7.  Declaratory Judgment Claims Are Viable Counterclaims ........................ 18

8.  Defendant's Affirmative Defenses are Well Pled ........................................ 20

# TABLE OF AUTHORITIES

**Cases**

*Adames v. G.B.Rests. Inc.,* 12–CV–569S, 2014 WL 202380, at *2 (W.D.N.Y. Jan. 16, 2014) . 21

*Allen v. WestPoint–Pepperell, Inc.,* 945 F.2d 40, 44 (2d Cir.1991) ............................................. 5

*Aros v. United Rentals, Inc.,* 10–CV–73, 2011 WL 5238829, at *3 (D.Conn. Oct. 31, 2011).  21

*Cognex Corp. v. Microscan Sys., Inc.,*  990 F.Supp.2d 408, 418, (S.D.N.Y. Dec. 31, 2013 ..... 21

*Cohen v. Citibank, N.A.,* 954 F. Supp. 621, 626 (S.D.N.Y. 1996) ............................................. 17

*Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) .................................... 5

*Couldock & Bohan, Inc. v. Societe Generale Sec. Corp.,* 93 F. Supp. 2d 220 (D. Ct. 2000) . 17,18

*Eastside Church of Christ v. National Plan, Inc.,* 391 F.2d 357, 362 (5th Cir. 1968). .............. 13

*Found. Ventures, LLC v. F2G, LTD.,* 2010 WL 3187294, at *6 (S.D.N.Y. Aug. 11, 2010)...... 18

*Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984) ................ 5

*Hon Hai Precision Indus. Co., Ltd. v. Wi–LAN, Inc.,* 12–CV–7900, 2013 WL 2322675, at *9

(S.D.N.Y. May 28, 2013) ................................................................................................... 21

*In re Gordon Wesley Sodorff, Jr.* 50 S.E.C. 1249, at *4 (1992)................................................... 10

*Jaghory v. N.Y. State Dep't of Educ.,* 131 F.3d 326, 329 (2d Cir.1997) ...................................... 5

*James v. Nat'l Fin., LLC,* 132 A.3d 799, 810 (Del. Ch. 2016) ................................................... 19

*King v. Ron's Mobile Homes Sales, Inc.,* 2009 WL 2243967, *3, Del. CCP, C.A. No. 00-12-
    027, Clark, Jr., J. (July 23, 2009) ............................................................................. 19

*Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 387 (1970). ........................................... 17

*New England Health Care Employees Welfare Fund v. iCare Mgmt., LLC,* 792 F.Supp.2d 269,
    288 (D.Conn.2011). ..................................................................................................... 20

*NovaFund Advisors, LLC v. Capitala Grp., LLC,* 2020 WL 230089, at *13 (D. Conn. Jan. 14
    2020) ............................................................................................................................. 16

*Petroci v. Transworld Sys., Inc.,* 12–CV–00729, 2012 WL 5464597, at *2 (W.D.N.Y. Oct. 19,
    2012) ............................................................................................................................. 21

*Pompano-Windy City Partners, Ltd. v. Bear Stearns & Co., Inc.,* 794 F. Supp. 1265, 1288
    (S.D.N.Y. 1992); ......................................................................................................... 17

*Reg'l Props., Inc. v. Fin. and Real Estate Consulting Co.,* 678 F.2d 552, 561 (5th Cir. 1982) .... 8

*Roth v. SEC,* 22 F.3d 1108, 1109 (D.C. Cir. 1994) ..................................................... 13

*Royal Air Props., Inc. v. Smith,* 312 F.2d 210, 213 (9th Cir. 1962) ............................ 17

*RWP Consol., L.P. v. Salvatore*, 534 F. Supp. 2d 364, 368 (D. Conn. 2008) .......................... 18

*Scott v. WorldStarHipHop, Inc.,* 10–CV–9538, 2012 WL 5835232, at *3 (S.D.N.Y. Nov. 14,
    2012) ............................................................................................................................. 21

*SEC v. Big Apple Consulting USA, Inc.,* 783 F.3d 786 (11th Cir. 2015) ..................................... 9

*SEC v. Merchant Capital,* 311 Fed.Appx. 250, 252 (11th Cir. 2010) ......................................... 4

*SEC vs. Almagarby*, 479 F.Supp.3d 1266 (SD FL 2020), ....................................................... 8,11

*Serby v. First Alert, Inc.*, 934 F.Supp.2d 506, 515–16 (E.D.N.Y.2013); ................................... 21

*Slomiak v. Bear Stearns & Co.*, 597 F. Supp. 676, 681-82 (S.D.N.Y. 1984). ........................... 17

*Stonehill v. Sec. Nat. Bank*, 68 F.R.D. 24, 32 (S.D.N.Y. 1975) ................................................... 20

*Tardif v. City of New York*, 302 F.R.D. 31, 36 (S.D.N.Y. 2014) ................................................. 21

*Transamerica Mortgage Advisors, Inc. (TAMA) v. Lewis*, 444 U.S. 11, 19 (1979), ................. 17

*Walsh v. City of New York*, 585 F.Supp.2d 555, 557 (S.D.N.Y.2008) ..................................... 20

*Warfield v. Alaniz*, 569 F.3d 1015, 1024-25 (9th Cir. 2009). .................................................... 13

iv

**Statutes**

15U.S.C. § 78o(a)(1) ................................................................................ 6

15 U.S.C § 78cc(b), ............................................................................ 16, 17

15 U.S.C. § 78c(a)(5)(A) and (B) ............................................................. 7

15 U.S.C. § 78o(b)(8), ............................................................................ 14

Fed.R.Civ.P. 12(b)(6) ............................................................................. 5

Section 15(a)(1) of the Exchange Act, 15 U.S.C. § 78o(a)(1) ........................................ 3, 7, 13

Uniform Declaratory Judgment Act, 28 U.S.C. §§ 2201 ......................................... 4

**Treatises**

Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1274 (3d ed.).  22

Defendant TPT Global Tech, Inc. (hereinafter "TPT") submits this memorandum of law in opposition to the motion by EMA Financial, LLC (hereinafter "Plaintiff") which seeks dismissal of TPT's counterclaims and affirmative defenses.

## PRELIMINARY STATEMENT

Plaintiff, a "dealer" as defined by the federal securities laws, is a well-known "toxic lender" which utilizes securities purchase agreements, coupled with promissory notes, to obtain securities in public companies, at discounted prices, and immediately sell same for significant profits.

In this action, Plaintiff seeks to recover over 7.5 million dollars based on a $250,000 loan to TPT, a loan for which Plaintiff has already received its principal balance.

The agreements upon which Plaintiff sues are unenforceable according to Section 29(b) of the Exchange Act which renders every agreement in violation of the Exchange Act unenforceable. Plaintiff's agreements, and its entire business model, violate Section 15 of the Exchange Act, which requires it to register as a dealer. It is not so registered.

Plaintiff alleges four causes of action, for specific performance under the unenforceable agreements, breach of contract, a permanent injunction, and for costs, expenses, and attorney's fees.

1

TPT filed an amended answer, affirmative defenses, and counterclaims ("Answer and Counterclaims"). As set forth in the Answer and Counterclaims, the underlying agreements are unenforceable, as Plaintiff is acting in violation of the federal securities laws, as an unregistered securities dealer. The underlying agreements are void and cannot be breached. The remainder of the claims are therefore invalid, as there is no enforceable agreement between the parties.

No discovery has been conducted in this matter.

Plaintiff's motion to dismiss fails as it has misconstrued the pleadings in this matter, and the case law governing these issues. As set forth below, the motion must be denied, as TPT has complied with the appropriate pleading standards to defeat the motion.

## STATEMENT OF FACTS

EMA is what is known as a toxic lender in the securities industry. Its business model is to induce small public companies to enter into convertible loan transactions, wherein EMA loans the issuer money pursuant to a convertible note. The note is convertible to common stock at below-market values. EMA then converts portions of the loan to stock, sells the stock for an immediate and substantial profit, converts an additional portion of the Note to stock, sells that position, and repeats the process until the note is fully converted.

EMA's business model is to conduct these securities transactions, as a "dealer" without registration, and in violation of the federal securities laws. The underlying agreements are therefore void.

## ARGUMENT

## 1.    TPT Has Not Made a Securities Fraud Claim

Each of Defendant's four counterclaims is well-pled and should not be dismissed. It cannot be said that Defendant can prove no set of facts to support the counterclaims, in fact, such evidence exists, in part from the pleadings of the Plaintiff itself here, and in other cases brought by the Plaintiff against other issuers.

Plaintiff mistakenly believes that the first counterclaim, for violation of Section 15(a)(1) of the Exchange Action [15 U.S.C. § 78O(A)(1)] is a securities fraud claim. It is not. While Plaintiff repeatedly states that TPT has made a claim for securities fraud, the simple fact is that such a claim has not been asserted.[1]

TPT has alleged four counterclaims – first for violation of Section 15(a)(1) of the Exchange Action [15 U.S.C. § 78O(A)(1)] for declaratory judgment declaring: (i) EMA, by its actions, violated Section 15(a)(1) of the Exchange Act; and (ii) pursuant to 15 U.S.

---

[1] Perhaps Plaintiff simply cut and pasted its arguments from one of its 14 other lawsuits where it has admitted to facts setting forth its conduct as a dealer, where other issuers who were the subject of this "toxic lender" set forth counterclaims for securities fraud. TPT has not done so here, and the entire argument in Point I by the Plaintiff is irrelevant.

3

Code § 78cc the agreements as void and/or rescinded. A violation of Section 15 of the Exchange Act is not part of the anti-fraud statutes and does not require proof of fraud, or scienter.[2]

The Second Counterclaim is also for declaratory judgment, requesting that the Court, pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. §§ 2201 declare: (i) pursuant to Delaware law, the underlying agreements are unconscionable; (ii) the underlying agreements are unenforceable and/or portions are unenforceable, such as the liquidated damages sections and that to the extent the agreement is enforceable the legal fee provisions of the agreements be mutual.

The Third Counterclaim is for unjust enrichment, based on the fact that EMA through improper conversions, received shares of TPT it was not entitled to receive pursuant to the underlying agreements; that EMA was enriched and thus benefited at the expense of TPT.

The Fourth Counterclaim is for attorney's fees, pursuant to the attorney fee provision in the SPA and the Note.

---

[2] Section 15 is not one of the anti-fraud provisions of the Exchange Act, and does not require scienter and is a strict-liability offense. *SEC v. Merchant Capital,* 311 Fed.Appx. 250, 252 (11th Cir. 2010)

## 2.      The Motion to Dismiss Must Be Denied

In ruling on a motion to dismiss under Fed.R.Civ.P. 12(b)(6), the Court must

accept all well-pleaded allegations as true and draw all reasonable inferences in favor of

the pleader. *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59

(1984); *Allen v. WestPoint–Pepperell, Inc.,* 945 F.2d 40, 44 (2d Cir.1991). Borrowing from

caselaw regarding complaints, it is axiomatic that a counterclaim should not be

dismissed for failure to state a claim unless it appears beyond doubt that the defendant

can prove no set of facts in support of his claim which would entitle him to relief. *Conley*

*v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (footnote omitted); *Jaghory v.*

*N.Y. State Dep't of Educ.,* 131 F.3d 326, 329 (2d Cir.1997). "The issue is not whether a

plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to

support the claims. Indeed, it may appear on the face of the pleadings that a recovery is

very remote and unlikely but that is not the test." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94

S.Ct. 1683, 40 L.Ed.2d 90 (1974).

## 3.      Section 15(a)(1) is Not Part of the Anti-Fraud Provisions of the Exchange Act

Section 15 of the Exchange Act is not part of the anti-fraud statutes and does not

require proof of fraud, or scienter. There simply is no cause of action for securities fraud

alleged in the counterclaims. There are factual allegations regarding market

manipulation, which again EMA does not deny, but those relate to the unjust

enrichment claim, and the fact that EMA, by its conduct, drove down the price of the underlying securities in order to increase the number of shares that it could convert and thereby increasing its profit from the conversion of the underlying debt instruments.[3]

Section 15 is a registration violation and does not require an allegation, or proof of, scienter, or fraud. The simple fact, as discussed below, is that EMA is in the business of buying and selling securities for its account as part of a regular business, and as such, must register as a dealer with the SEC. [15U.S.C. § 78o(a)(1)]. [4]

Its failure to do so renders its dealer-related agreements voidable.

## 4.    TPT Has Sufficiently Pled that EMA is an Unregistered Dealer and Violated Section 15

TPT seeks to have the underlying agreements declared void and unenforceable as EMA is in violation of Section 15 of the Exchange Act. EMA has alleged that it entered into two agreements, the SPA and the Note. The note was convertible, at the option of EMA, EMA admits that it entered into the agreements, that it exercised the

---

[3] Perhaps Plaintiff simply cut and pasted its arguments from one of its 15 other lawsuits where it has admitted to facts setting forth its conduct as a dealer, where other issuers who were the subject of this "toxic lender" set forth counterclaims for securities fraud. TPT has not done so here, and the entire argument in Point I by the Plaintiff is irrelevant.

[4] EMA's admission that it does not buy or sell on behalf of any other person or entity is an admission that it meets this part of the "dealer" definition. See Plaintiff's memorandum page 10. Its statement that it is not engaging in these transactions for investment purposes is also an admission that it is a dealer. Memorandum page

conversion rights pursuant to the Note, sold those securities, and sought to convert the balance of the Note into shares in order to sell those shares. It seeks to recover from TPT the proceeds of the conversions that it did not receive.

EMA by its own admissions and conduct, is a dealer, and has not registered as a dealer, thereby violating the Exchange Act.

Section 15(a)(1) of the Exchange Act, 15 U.S.C. § 78o(a)(1) provides, in pertinent part, that "[i]t shall be unlawful for any . . . dealer which is either a person . . . to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security . . . unless such . . . dealer is registered in accordance with subsection (b) of this section."

Section 3 of the Exchange Act defines a "dealer" as "any person engaged in the business of buying and selling securities . . . for [their] own account through a broker or otherwise," but excludes from the definition "a person that buys or sells securities . . . for such person's own account . . . but not as a part of a regular business." 15 U.S.C. § 78c(a)(5)(A) and (B).

Broad definitions of "broker" and "dealer" advance the Exchange Act's purpose of investor protection because it "is through the registration requirement that some discipline may be exercised over those who may engage in the securities business and by which necessary standards may be established with respect to training, experience,

and records." *Reg'l Props., Inc. v. Fin. and Real Estate Consulting Co.*, 678 F.2d 552, 561 (5th

Cir. 1982) (citation and quotation marks omitted).

EMA argues that "[b]ased on years of SEC guidance, it is indisputable that EMA

does not fall under the definition of a dealer, but that instead, it is categorized as a

trader. A "trader" is a party that buys and sells securities for its accounts, but does not

fall within the definition of a dealer and is not required to register with the SEC.

Various courts disagree with EMA's legal pronouncement and this exact

argument was rejected by the Court in *SEC vs. Almagarby*, 479 F.Supp.3d 1266 (SD FL

2020), where the Court, addressing this exact argument stated:

> Defendants cite various factors and activities identified in previous SEC releases
> or SEC staff no-action letters as "[e]vidence of those activities are required for the
> SEC to prove that Defendants were engaged in the business of buying and selling
> as part of a regular business, and the absence of any such evidence warrants
> finding summary judgment in favor of Defendants." The Court disagrees. The
> factors listed are merely examples of activity or actions that might render one a
> dealer. There is nothing in any of the cited releases or no-action letters that
> implies that the listed factors are an exclusive or exhaustive checklist that creates
> a burden of proof for the SEC. Moreover, SEC no-action letters are not binding
> pieces of legislation, rather they are "informal advice given by members of the
> Commission's staff" that "state with respect to a specific proposed transaction
> that the staff will not recommend to the Commission that it take enforcement
> action if the transaction is consummated exactly as it has been described."
> [citations omitted]

The definition of a "dealer" has not been widely analyzed by the courts until

recently. However, in 2015 the Eleventh Circuit addressed the meaning of the term

"dealer" in *SEC v. Big Apple Consulting USA, Inc.*, 783 F.3d 786 (11th Cir. 2015).  In

finding that Big Apple was a dealer, the Court stated:

8

To qualify as a "dealer," a person must be in the "business of" buying and selling securities. We think the centerpiece to this definition is the word "business," which is defined as "[a] commercial enterprise carried on for profit, a particular occupation or employment habitually engaged in for livelihood or gain." *Black's Law Dictionary 239* (10th ed. 2009) (emphasis added). Central to this definition is profit or gain. While evidence of merely some profits from buying and selling securities may alone be inconclusive proof, the defendants' entire business model was predicated on the purchase and sale of securities. Id. at 809.

The Court further stated:

Big Apple and its subsidiaries depended on acquiring client stock and selling that stock to support operations and earn a profit. In their brief, the defendants do not contest that they received most of their compensation by obtaining and selling their clients' stocks. Nor could they, as testimony… reveals that the defendants placed a high priority on generating a profit from trades. Id. at 809-810.9

The court in *United States Sec. & Exch. Comm'n v. River N. Equity LLC*, 415 F. Supp. 3d 853, 859 (N.D. Ill. 2019), in determining that the defendant was a dealer, and required registration stated:

the Court finds it particularly significant that according to the allegations, like an underwriter, River North: (1) purchased stocks at a discounted price directly from numerous issuers, including NTEK and NTGL through Foley as their control person (instead of purchasing stocks already in the marketplace, like a trader); and (2) turned a profit not from selling only after market prices increased (like a trader), but rather from quickly reselling at a marked-up price. This arrangement has been recognized by the SEC as characteristic of a "dealer." *See Gordon Wesley Sodorff, Jr.*, 50 S.E.C. 1249, 1992 WL 224082, at *5 (Sep. 2, 1992). The Court thus rejects River North's argument that the SEC has failed to allege it was a "dealer."

The Court in *SEC vs. Almagarby*, 479 F.Supp.3d 1266 (SD FL 2020) found that the defendant, like the Plaintiff herein, engaged in multiple transactions lending money to

9

public companies via a convertible note and obtaining and selling securities as a result of the conversion of the note, was acting as a dealer. The Court quoted *Big Apple* and stated:

> …the centerpiece to [the definition of dealer] is the word 'business,' " and found that where a company's business model is based entirely on the purchase and sale of securities, that fact constitutes conclusive proof that the company is a dealer:

> …the defendants' entire business model was predicated on the purchase and sale of securities. [The defendants] depended on acquiring client stock to support operations and earn a profit … As further evidence of their dealer status, [the defendants] purchased [an issuer's] stocks at deep discounts pursuant to its contractual agreement with [the issuer] and then sold those stocks for profit.

This is EMA's exact business model.

The definition of a dealer under the Exchange Act "connote[s] a certain regularity of participation in securities transactions at key points in the chain of distribution. *Mass. Fin. Servs., Inc. v. Sec. Investor Prot. Corp., 411 F. Supp. 411, 415 (D. Mass. 1976).* "The primary indicia in determining that a person has 'engaged in the business' within the meaning of the term 'dealer' is that the level of participation in purchasing and selling securities involves more than a few isolated transactions. There is no requirement, however, that such activity be a person's principal business or the principal source of income." *In re Gordon Wesley Sodorff, Jr.* 50 S.E.C. 1249, at *4 (1992) (finding that a registered representative engaged in the securities business as a dealer by selling 556,227 shares of an issuer's stock to seventeen investors over two months).

10

Presently on file with the United States District Courts are 15 different actions, filed by EMA against various issuers wherein EMA admits that it has engaged in transactions with at least 15 different issuers, where it entered into transactions similar to the transactions at issue. In those transactions, EMA converted and sold or attempted to convert and sell shares of common stock for its account.[5]

The Court in *SEC vs. Almagarby*, 479 F.Supp.3d 1266 (SD FL 2020) adopted the Big Apple decision, and found that the defendants were dealers in that they: (1) bought and sold securities for their account; (2) were in the "business" of doing so within the meaning of the Eleventh Circuit's decision in Big Apple and other case law; (3) had the requisite high levels of buying and selling; (4) frequently accounted for a substantial amount of the selling volume when they sold shares; (5) profited by acquiring stock at deep discounts instead of from the appreciation of the securities; and (6) lacked investment intent, as shown by both their admissions and their conduct.

---

[5] See, Auctus Fund LLC and EMA Financial, LLC vs. Sunstock, Inc. , 2018-cv-12568 (Mass. DC); Auctus Fund LLC and EMA Financial, LLC vs. Omagine, Inc., et al. 2019-cv-10700 (Mass. DC); EMA Financial LLC vs. Textmunication Holdings, Inc. 2015-cv-09420 (SDNY); EMA Financial LLC vs. First Harvest Corp, et al 2017-cv-08072 (SDNY); EMA Financial LLC vs Petrone Worldwide, Inc., et al 2017-cv-08558 (SDNY); EMA Financial LLC vs. Joey New York, Inc. et al 2017-cv-09706 (SDNY); EMA Financial, LLC vs. AIM Exploration, Inc., et al 2018-cv-00145 (SDNY); EMA Financial, LLC vs. nFUSZ, Inc., 2018-cv-03634 (SDNY); EMA Financial, LLC vs 5BARZ International Inc. et al, 2018-cv-04995 (SDNY); EMA Financial, LLC vs. Redhawk Holdings Corp., et al 2018-cv-11897 (SDNY); EMA Financial, LLC vs. Vystar Corp., 2019-cv-01545 (SDNY); EMA Financial, LLC vs. Flitways Technology, Inc., et al, 2020-cv-00324 (SDNY); Parallax Health Sciences, Inc. vs EMA Financial, LLC 2020cv02375 (SDNY); EMA Financial, LLC vs. WOD Retail Solutions, Inc.., 2020cv03519 (SDNY); EMA Financial, LLC vs. Pharmagreen Biotech, Inc. 2020-cv-05662 (SDNY)

Defendant has presented sufficient allegations to deny a motion to dismiss. Defendant has alleged that EMA is an unregistered "dealer" in that it: (1) bought and sold securities for its account; (2) was in the "business" of doing so; (3) had the requisite high levels of buying and selling; (4) frequently accounted for a substantial amount of the selling volume when they sold shares; (5) profited by acquiring stock at deep discounts instead of from the appreciation of the securities; and (6) lacked investment intent, as shown by both their admissions and their conduct. Answer, Affirmative Defenses, and Counterclaims, paragraph 28-40,

There is no dispute that EMA buys and sells securities for its own account and profits by acquiring stock at deep discounts instead of from the appreciation of the securities and that it lacks investment intent, by its own admissions in its pleading here, and in the other cases.

Aside from the multiple lawsuits filed by EMA, which are, at a minimum, only the transactions where EMA's targets were unable to meet the demands of their Notes and SPA and not full scope of EMA's dealer activities, Defendant believes that discovery will establish that EMA had the requisite level of business and selling, frequently accounts for a substantial amount of the selling volume when it sold shares and was in fact, in the business of buying and selling securities for its own account.

EMA does not deny any of this, but rather puts up a myriad of irrelevant arguments claiming that it does not invest for customers, that it is not a market maker,

that it does not offer investment advice, and that it does not buy and sell securities for any other person. None of those facts are relevant to the question of whether EMA is a dealer. (Plaintiff Memorandum of law page 10).

## 5.    EMA Was Required to Register with the SEC as a Dealer

The SEC has repeatedly stated that persons who act as "dealers" (or "brokers") must register with the Commission unless they are specifically exempt from registration. *Warfield v. Alaniz*, 569 F.3d 1015, 1024-25 (9th Cir. 2009). See Exchange Act Section 15(a)(1), 15 U.S.C. § 78o(a)(1) (prohibiting a broker or dealer from using the mail or any other instrumentality of interstate commerce "to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security" unless "registered in accordance with [Section 15(b) of the Exchange Act]").

The registration requirement "serves as the keystone of the entire system of broker-dealer regulation." *Roth v. SEC*, 22 F.3d 1108, 1109 (D.C. Cir. 1994) (cites and quotes omitted); *Eastside Church of Christ v. National Plan, Inc.*, 391 F.2d 357, 362 (5th Cir. 1968).

Registration serves a number of important regulatory objectives including compliance with rules established by self-regulatory organizations for broker/dealers, see 15 U.S.C. § 78o(b)(8), and with Commission rules concerning consumer protection,

13

recordkeeping and financial reporting. See generally, 17 C.F.R. §§ 240.15c3-3, 240.15c3-2, 240.8c-1, 250.l 7a-3, 17a-4 and 17a-l l.

EMA is attempting to avoid the regulatory oversight of its conduct by failing to register as a dealer.

TPT has alleged, beyond the scope of what is required pursuant to FRCP 8(a)(2), that Plaintiff's actions that fall into the category of an unregistered dealer. See Answer, Affirm. Defenses and Counterclaims, Paragraphs 26-40.

EMA has admitted here, and in the other cases that it has, on numerous occasions, that loans money to financially strapped issuers, converts the debt into newly issued shares of stock from the issuers at deeply discounted prices—which it negotiates in advance of the purchase — and sells that stock into the market at a profit immediately upon receipt of the same through the conversion process.

This mechanism, which gave Plaintiff a spread (or markup) on the stock that they sold, is a common attribute of a securities dealer.

Plaintiff was not registered as a dealer with the Securities and Exchange Commission. Plaintiff, by its actions, violated Section 15(a)(1) of The Exchange Act, and pursuant to 15 U.S. Code § 78cc, the underlying agreements at issue in the transaction are void and/or rescinded.

As set forth herein, Plaintiff was acting as a dealer before and during, the events herein. By failing to register as a dealer, Plaintiff was prohibited from effecting transactions in securities, or attempting to induce the purchase or sale of a security, exactly the transactions contemplated by the SPA and the Note.

Before effectuating such agreement and before performing such transactions involved in the agreements, to wit, the acquisition of shares from issues through the use of conversions and subsequent sales of the shares for its own account and benefit, plaintiff was required to register with the Securities & Exchange Commission ("SEC"). It did not do so. Its failure to register, and thereafter act without doing so pursuant to the agreement, is a violation of Section 15(a) of the Exchange Act, and due to the failure, the performance of the entire purpose of the SPA and the Note violates the Exchange Act.  EMA has repeatedly engaged in such transactions and did so in the instant case. In fact, part of its damage calculations is based on the alleged failure of TPT to perform after Plaintiff performed.

As such, EMA has violated Sections 15 of the Exchange Act, which triggers the permissible rescission aspect of Section 29(b) of the Exchange Act.

TPT alleges, and EMA does not deny that it attempted "to effect transactions in, or to induce or to attempt to induce the purchase or sale of, securities." The entire purpose of the agreements was for EMA to purchase securities, through the conversion mechanism, at a market discount, so that it could sell same as part of its dealer business.

15

6.    **Recission is an Appropriate Remedy for the Section 15 Violations**

Rather than address the Section 15 violation, Plaintiff claims that there is no private right of action under Section 15. However, the counterclaims are based on Section 15 and Section 29(b) of the Exchange Act.

Section 29(b) of the Exchange Act, provides: Every contract made in violation of any provision of this chapter or of any rule or regulation thereunder, and every contract . . . the performance of which involves the violation of, or the continuance of any relationship or practice in violation of, any provision of this chapter or any rule or regulation thereunder, **shall be void (1) as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made or engaged in the performance of any such contract** . . . 15 U.S.C. § 78cc(b).

TPT's claim is that because EMA was acting as an unregistered dealer in violation of Section 15(a)(1) of the Exchange Act, the agreements at issue are voidable at the option of TPT. Such a claim is permissible. See, e.g., *NovaFund Advisors, LLC v. Capitala Grp., LLC*, 2020 WL 230089, at *13 (D. Conn. Jan. 14 2020) (counterclaim asserted a viable claim for rescission by alleging plaintiff "was not and is not registered as a broker with the appropriate federal and state securities regulators and/or self-regulatory agencies") (citation omitted); *Couldock & Bohan, Inc. v. Societe Generale Sec. Corp.*, 93 F. Supp. 2d 220, 231-32 (D. Conn. 2000)  (voiding a clearing agreement where plaintiff was an unregistered broker/dealer).

16

Under the Exchange Act, contracts that violate the Exchange Act are "voidable at the option of the innocent party." *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 387 (1970). The Agreements at issue herein, which are a transaction in a security, and are intended to induce further sales of securities violated the Exchange Act because Plaintiff, while conducting a business as a dealer, including the transactions at issue, failed to register as a dealer.

In *Transamerica Mortgage Advisors, Inc. (TAMA) v. Lewis*, 444 U.S. 11, 19 (1979), the Supreme Court reiterated that *Mills* had recognized the "right to rescind" a contract that is void under Section 29(b). *See also Royal Air Props., Inc. v. Smith*, 312 F.2d 210, 213 (9th Cir. 1962) (contract can be voided under Section 29(b) by "bring[ing] a suit to rescind"); *Cohen v. Citibank, N.A.*, 954 F. Supp. 621, 626 (S.D.N.Y. 1996); *Pompano-Windy City Partners, Ltd. v. Bear Stearns & Co., Inc.*, 794 F. Supp. 1265, 1288 (S.D.N.Y. 1992); *Slomiak v. Bear Stearns & Co.*, 597 F. Supp. 676, 681-82 (S.D.N.Y. 1984).

To state a claim for rescission under 15 U.S.C § 78cc(b), a party must show "that (1) the contract involved a prohibited transaction, (2) he is in contractual privity with the [opposing party], and (3) he is in the class of persons the Act was designed to protect*." RWP Consol., L.P. v. Salvatore*, 534 F. Supp. 2d 364, 368 (D. Conn. 2008) (quoting *Pompano-Windy City Partners*, 794 F. Supp. at 1288); a*ccord Found. Ventures, LLC v. F2G, LTD.*, 2010 WL 3187294, at *6 (S.D.N.Y. Aug. 11, 2010).

17

This test manifests the common-law principle that a contract to perform an illegal act is void. *See generally Couldock & Bohan*, Inc., 93 F. Supp. 2d at 228 ("The federal and state securities statutes codify the common law doctrine invalidating contracts that violate their respective provisions.").

The acquisition of the shares of common stock and the sale of same into the market is the purpose of the SPA and Note. The entire purpose of the transaction is to induce the purchase of a security by EMA and the issuance of that security by TPT, so that EMA can then sell that security into the market at a profit.[6]

The entire purpose of the SPA and the Note is to induce the purchase of a security in order to sell that security. Since EMA is a dealer and has engaged in such transactions on at least 15 other occasions, its conduct violates Section 15 of the Exchange Act, the underlying agreements, or at least the conversion provisions of same, are voidable, and the motion to dismiss the Counterclaims must be denied.

## 7.    Declaratory Judgment Claims Are Viable Counterclaims

The SPA and the Note are governed by Delaware law. Pursuant to Delaware law, a party asserting a claim of unconscionability may bring it as an affirmative claim via a

---

[6] Depositions of EMA will establish the purpose of the agreement, which was to induce the sale of a security through the conversion feature of the note, and hence the existence of the conversion feature, and the Securities Purchase Agreement. The fact that there are at least 15 other instances of EMA converting notes to securities belies any contention that EMA was simply lending money to TPT, and the true purpose of the SPA and Note.

18

declaratory action, or an independent cause of action. *See James v. Nat'l Fin., LLC*, 132

A.3d 799, 810 (Del. Ch. 2016) (Granting claim for declaratory relief that loan agreement

is unconscionable).

Thereafter, if successful voiding the agreements under either such theory, there

would be no contractual terms to enforce, and thus, the claim is not duplicative.

Even if the totality of the agreements are not rendered void under this theory,

TPT has attacked the attorneys' fees provision as being unconscionable. *See King v.

Ron's Mobile Homes Sales, Inc.*, 2009 WL 2243967, *3, Del. CCP, C.A. No. 00-12-027, Clark,

Jr., J. (July 23, 2009) ("Although the attorney's fees clause is couched in one-sided

language, the Court finds the contractual intent of the that the clause be mutually

applicable, lest it be unconscionable.").

Accordingly, Plaintiff's argument fails based upon the alternative pleading

theory as well as the partial ruling theory.

As to the viability of the unconscionability issue, the allegations are sufficient to

overcome the motion. Alleges that TPT has not offered evidence to support the

counterclaim (Memorandum, page 14). However, at the pleading stage evidence is not

required, all that is required are sufficient allegations, and TPT has alleged the

necessary elements to sustain the claim at this stage

Plaintiff also argues dismissal of the declaratory action should be granted on the

grounds a declaratory action is not a stand-alone cause of action. However, on the very

19

issue as to rescission of a contract in violation of the Exchange Act, this Court has ruled

a declaratory judgment is a permissible vehicle for the relief sought. *Stonehill v. Sec. Nat.*

*Bank*, 68 F.R.D. 24, 32 (S.D.N.Y. 1975) (ruling that the party bringing a rescission claim

may do so by way of defense or in his declaratory action, holding the void provision of

Rule 29(b) "to mean that the violator may not enforce his claimed contractual rights

against anyone, no matter whom").


**8.     Defendant's Affirmative Defenses are Well Pled**

Without providing any legal authority, Plaintiff claims that the affirmative

defenses should be stricken as conclusory, factually unsupported and/or

unsubstantiated, or inadequately plead

"Motions to strike affirmative defenses are generally disfavored." *Walsh*

*v. City of New York,* 585 F.Supp.2d 555, 557 (S.D.N.Y.2008) (Sweet, J.) (internal quotation

marks omitted). "The standard to prevail on a motion to strike an affirmative defense is

demanding." *New England Health Care Employees Welfare Fund v. iCare Mgmt., LLC,* 792

F.Supp.2d 269, 288 (D.Conn.2011). *Tardif v. City of New York*, 302 F.R.D. 31, 36 (S.D.N.Y.

2014) (Wood, J.) See, also, *Raymond Weil, S.A. v. Theron*, 585 F.Supp.2d 473, 489–90

(S.D.N.Y.2008) (McMahon, J.) ("There is nothing dumber than a motion to strike

boilerplate affirmative defenses; it wastes the client's money and the court's time.")

"[T]o prevail on a motion to strike: (1) there may be no question of fact which might allow the defense to succeed; (2) there may be no substantial question of law, a resolution of which could allow the defense to succeed; and (3) the moving party must show that it is prejudiced by the inclusion of the defense." *Cognex Corp. v. Microscan Sys., Inc.,* 990 F.Supp.2d 408, 418, (S.D.N.Y. Dec. 31, 2013) (Rakoff, J.) (internal quotation marks omitted).

The courts have repeatedly held that specificity standards do not apply when addressing affirmative defenses. *See, e.g., Adames v. G.B.Rests. Inc.,* 12–CV–569S, 2014 WL 202380, at *2 (W.D.N.Y. Jan. 16, 2014); *Vale v. City of New Haven Police Dep't,* 11–CV–00632, 2013 WL 5532133, at *3 (D.Conn. Oct. 4, 2013); *Hon Hai Precision Indus. Co., Ltd. v. Wi–LAN, Inc.,* 12–CV–7900, 2013 WL 2322675, at *9 (S.D.N.Y. May 28, 2013) (Scheindlin, J.); *Serby v. First Alert, Inc.,* 934 F.Supp.2d 506, 515–16 (E.D.N.Y.2013); *Scott v. WorldStarHipHop, Inc.,* 10–CV–9538, 2012 WL 5835232, at *3 (S.D.N.Y. Nov. 14, 2012) (Castel, J.); *Petroci v. Transworld Sys., Inc.,* 12–CV–00729, 2012 WL 5464597, at *2 (W.D.N.Y. Oct. 19, 2012) report and recommendation adopted, 12–CV–729, 2012 WL 5464579 (W.D.N.Y. Nov. 8, 2012); *Aros v. United Rentals, Inc.,* 10–CV–73, 2011 WL 5238829, at *3 (D.Conn. Oct. 31, 2011).

"As numerous federal courts have held, an affirmative defense may be pleaded in general terms and will be held to be sufficient, and therefore invulnerable to a motion

21

Case 1:20-cv-08781-VSB-BCM    Document 19    Filed 03/02/21    Page 28 of 28

to strike, as long as it gives the plaintiff fair notice of the nature of the defense." Charles

Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1274 (3d ed.).

Defendant's affirmative defenses give Plaintiff fair notice of the nature of the

defenses, and that there are questions of fact and law that might allow the defenses to

succeed. The motion to dismiss those defenses should be denied.

## CONCLUSION

For the reasons stated herein, TPT respectfully requests that the Court deny the

Plaintiff's motion to dismiss and grant TPT such other and further relief as it deems

appropriate.

Dated: March 1, 2021                      SALLAH ASTARITA & COX, LLC

                                           By: __/s/ *MARK J. ASTARITA*____
                                              Mark J. Astarita
                                         Attorneys for Defendant
                                         60 Pompton Avenue
                                         Verona, New Jersey 07044
                                         973-559-5566
                                         mja@sallahlaw.com